USDC- GREENBELT
'25 APR 4 PM 2:28 JM

JC/JEJ: USAO 2025R00004

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. 25-cr-00094-DLB |
| | * | |
| CHRISTOPHER BRACKINS, | * | (Conspiracy to Commit Bribery of a |
| | * | Federal Official, 18 U.S.C. §§ 371, |
| Defendant | * | 201(b)(1)(A); Wire Fraud, |
| | * | 18 U.S.C. § 1343; Possession of a |
| | * | Machinegun, 18 U.S.C. § 922(o); |
| | * | Forfeiture, 18 U.S.C. § 924(d), |
| | * | 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. |
| | * | § 853(p), 28 U.S.C. § 2461(c)) |
| | * | |

*******

### INFORMATION

### COUNT ONE
(Conspiracy to Commit Bribery of a Federal Official)

The United States Attorney for the District of Maryland and the Acting Chief of the Public Integrity Section of the Criminal Division of the United States Department of Justice charge that:

### Introduction

1. The defendant **CHRISTOPHER BRACKINS** ("**BRACKINS**") formed Company A in the mid- to late-1990s to perform general construction work. **BRACKINS** was the sole owner of Company A.

2. The General Services Administration ("GSA") was an agency of the executive branch of the United States government. Among other things, GSA was responsible for the development and management of property owned or leased by the federal government.

3. At all relevant times, Public Official A was a contracting officer's representative employed by the GSA.

4. **BRACKINS** first met Public Official A in or about 2007 or 2008 when **BRACKINS** was looking for federal contract work for Company A.

5. Between in or about 2018 and in or about 2021, Company A performed subcontracting work on certain GSA federal projects under prime contractor Company B and prime contractor Company C. Some of these GSA contracts were overseen on a day-to-day basis by Public Official A.

## The Conspiracy

6. Beginning in or about late 2018 and continuing until in or about late 2021, in the District of Maryland and elsewhere, the defendant,

**CHRISTOPHER BRACKINS,**

and Public Official A did knowingly and willfully combine, conspire, and agree together and with each other to engage in a corrupt scheme whereby Public Official A exercised his authority over the GSA contracting process to direct GSA federal project work to Company A, a company owned by **BRACKINS**, in exchange for cash and other things of value provided by **BRACKINS** and Company A, in violation of 18 U.S.C. § 201(b)(1)(A).

## Manner and Means of the Conspiracy

The manner and means of the conspiracy included, but were not limited to, the following:

7. Public Official A effectively paired Company A (**BRACKINS**'s company) with prime contractors Company B and Company C to work on GSA federal projects.

8. Public Official A solicited and accepted things of value from **BRACKINS**, including cash, checks, payments for repairs to Public Official A's vehicle, and payments for repairs at a residence owned by Public Official A's relative.

9. In exchange for these things of value, Public Official A directed GSA federal project work to Company A by causing GSA federal project work to be subcontracted from Companies B and C to Company A.

**Overt Acts**

In furtherance of the conspiracy and to achieve its purposes, **BRACKINS** and Public Official A committed the following overt acts, among others, in the District of Maryland and elsewhere:

Public Official A Began Soliciting Money from the Defendant

10. Between in or about 2018 and 2021, Public Official A operated out of a GSA facility at the St. Elizabeths Hospital campus in southeast Washington, D.C. There were a number of prime contractors working at the St. Elizabeths site, including Company B.

11. In or about late 2018, Public Official A was overseeing a roof repair project at the St. Elizabeths site for which Company B was serving as a prime contractor and Company A was serving as a subcontractor. Near the end of the completion of the project, Public Official A asked **BRACKINS** for $8,000 in cash in exchange for Public Official A's assistance in securing Company A's subcontract with prime contractor Company B. **BRACKINS** agreed to pay the funds to Public Official A. Accordingly, in or about November 2018, **BRACKINS** paid a fraudulently inflated bonus to one of **BRACKINS**'s employees and directed the employee to pay Public Official A approximately $8,000 in cash from the fraudulently inflated bonus check.

12. In or about January 2019, Public Official A once again solicited a payment from **BRACKINS** while **BRACKINS** was working on another project at the St. Elizabeths campus. **BRACKINS** agreed to pay Public Official A with a $3,800 check from Company A's account,

3

issued with the memo line "Chevy 2500 HD," even though **BRACKINS** did not engage in any transaction with Public Official A involving a vehicle of that make and model.

13. On or about January 29, 2019, Public Official A certified that the roof repair project at the St. Elizabeths site had been completed, a prerequisite to GSA's subsequent release of payment to Company B (which, in turn, paid Company A).

2020 and 2021: The Atkins Hall Building Project

14. In or about mid-2020, Public Official A invited **BRACKINS** to inspect a building on the St. Elizabeths campus called the Atkins Hall Building (also referred to as Building 31). The building required mold remediation and certain general repair work.

15. **BRACKINS** offered some guidance to Public Official A on the scope of work that would be necessary to remediate the Atkins Hall Building. **BRACKINS** provided an estimate of his costs, including profit and overhead. Public Official A suggested adding a 10 percent "contingency," which was abnormal for GSA projects.

16. Ultimately, Company C bid on the project, secured a contract for approximately $800,000, and subcontracted much of the work to Company A.

17. While **BRACKINS** and Company A were working on the Atkins Hall Building remediation project in late 2020 and early 2021, Public Official A solicited, demanded, and accepted payments from **BRACKINS**, including but not limited to:

    a.    In or about December 2020, **BRACKINS**, through a relative, paid approximately $3,100 for repairs to a vehicle owned by Public Official A.

    b.    In or about January 2021, **BRACKINS** paid a contractor approximately $8,000 to pay for repairs at a residence owned by Public Official A's relative.

4

  c. In or about February and March 2021, **BRACKINS** paid $25,000 to Public Official A using an intermediary, an individual with a long-standing relationship to Public Official A. Public Official A solicited the intermediary to accept the payments on Public Official A's behalf. **BRACKINS** paid the intermediary $25,000 in three payments. The intermediary in turn quickly remitted the funds in their entirety to Public Official A.

18. **BRACKINS** provided these things of value to Public Official A in exchange for Public Official A's official action in directing GSA federal project work to Company A by causing GSA federal project work to be subcontracted to Company A. **BRACKINS** believed that Public Official A would withhold federal project work from Company A if **BRACKINS** did not make the payments.

18 U.S.C. § 371
18 U.S.C. § 201(b)(1)(A)

## COUNT TWO
## (Wire Fraud)

The United States Attorney for the District of Maryland and the Acting Chief of the Public Integrity Section of the Criminal Division of the United States Department of Justice further charge that:

### Relevant Entities and Federal Programs

1. In or about October 2017, **BRACKINS** caused the formation of Company D. **BRACKINS** set up Company D on behalf of a young relative, who was the sole member of the entity.

2. The United States Small Business Administration ("SBA") was a federal government agency.

3. In response to the COVID-19 pandemic, the United States expanded an existing disaster-related program—the Economic Injury Disaster Loan ("EIDL")—to provide for loan assistance (including $10,000 advances) for small businesses and other eligible entities for loans up to $2 million.

4. The EIDL proceeds could have been used to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the disaster not occurred; however, such loan proceeds were not intended to replace lost sale or profits, or for the expansion of a business. Unlike certain other types of SBA-guaranteed loans, EIDL funds were issued directly from the United States Treasury, and applicants applied for EIDL funds directly through the SBA, via an online portal and application.

5. The EIDL application process, which also used certain outside contractors for system support, collected information concerning the business and the business owner, including information as to the gross revenues for the 12 months prior to the disaster (January 31, 2020), the

cost of goods sold, and information as to any criminal history of the business owner. Applicants electronically certified that the information provided was true and accurate and were warned that any false statement or misrepresentation to the SBA, or any misapplication of the loan proceeds may result in sanctions, including criminal penalties.

6. EIDL applications were received in and processed using computer servers also located outside Maryland. EIDL disbursement payments were initiated by the SBA using computer servers located in the state of Colorado, which transmitted the payment information to the Treasury using computer servers located in the state of Virginia.

## The Scheme to Defraud

7. In or about July 2020, in the District of Maryland and elsewhere, the defendant,

**CHRISTOPHER BRACKINS**,

did knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud the SBA and the United States Department of Treasury, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate commerce, certain writings, signs, signals, pictures, and sounds, that is the defendant **BRACKINS**, through Company D, obtained an approximately $36,200 EIDL loan through false and fraudulent pretenses.

## Manner and Means of the Scheme to Defraud

It was part of the scheme to defraud that:

8. **BRACKINS** forged the signature of his relative, who was the director of Company D, on documents required by SBA in connection with the EIDL loan.

9. **BRACKINS** generated a fake Company D board resolution along with falsified board minutes concerning Company D's acceptance of the loan, which were submitted to SBA pursuant to the loan agreement.

10. **BRACKINS**, after obtaining control of the funds through Company D, caused the majority of the borrowed EIDL loan funds to be transferred to Company A without SBA's written approval, notwithstanding a contractual limitation on preferential transfers to companies affiliated with or controlling the borrower.

## The Charge

11. On or about July 27, 2020, in the District of Maryland and elsewhere, the defendant,

**CHRISTOPHER BRACKINS,**

for the purpose of executing and attempting to execute the scheme and artifice to defraud, did knowingly transmit and cause to be transmitted by means of wire communication, in interstate commerce, writings, signs, signals, and sounds, namely an application to the SBA for an EIDL loan for Company D, which resulted in an interstate wire communication from Maryland to a location outside of Maryland.

18 U.S.C. § 1343

## COUNT THREE
### (Possession of a Machinegun)

The United States Attorney for the District of Maryland and the Chief of the Public Integrity Section of the Criminal Division of the United States Department of Justice further charge that:

On or about October 6, 2021, in the District of Maryland, the defendant,

**CHRISTOPHER BRACKINS**,

did knowingly possess a machinegun, that is, one Bushmaster model XM15-E2S, with an obliterated serial number.

18 U.S.C. § 922(o)

## FORFEITURE ALLEGATION

The United States Attorney for the District of Maryland and the Acting Chief of the Public Integrity Section of the Criminal Division of the United States Department of Justice further allege that:

1. Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C § 924(d), 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the defendant's conviction of the offenses set forth in Counts One through Three of this Information.

### Bribery and Wire Fraud Forfeiture

2. Upon conviction of the offenses set forth in Count One and Two, the defendant,

**CHRISTOPHER BRACKINS,**

shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offense.

### Firearm and Ammunition Forfeiture

3. Upon conviction of the offense set forth in Count Three, the defendant,

**CHRISTOPHER BRACKINS,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c), any firearms and ammunition involved in the offenses.

### Substitute Assets

4. If, as a result of any act or omission of the defendant, any such property subject to forfeiture:

    a. cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third person;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be subdivided without difficulty,

the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 28 U.S.C. 2461(c), shall be entitled to forfeiture of substitute property.

18 U.S.C. § 924(d)
18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c).

*Kelly O. Hayes* /sc
KELLY O. HAYES
United States Attorney
District of Maryland